# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY BANKS, | ) |
| | ) Civil Action No. 10 – 555 |
| Plaintiff, | ) |
| | ) District Judge David S. Cercone |
| v. | ) Chief Magistrate Judge Lisa Pupo Lenihan |
| | ) |
| LT. MECK, S.C.I. Forest, STEPHEN | ) |
| BEST, S.C.I. Forest, and P.L.N. | ) ECF No. 57 |
| TRACEY, S.C.I. Forest, | ) |
| | ) |
| Defendants. | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 57) be granted and that this case be closed.

### II. REPORT

Gary Banks ("Plaintiff") is an inmate currently confined at the State Correctional Institution at Camp Hill, Pennsylvania. He commenced this action against the following individuals employed at the State Correctional Institution at Forest located in Pine Grove, Pennsylvania: Lieutenant Meck, Correctional Officer Stephen Best, Physician's Assistant Rhonda Sherbine, and LPN Tracey.[1] In his Second Amended Complaint, Plaintiff alleges that Defendants violated his rights as protected by the Eighth and Fourteenth Amendments by using excessive force, denying him basic necessities, subjecting him to unconstitutional conditions of

---

[1] Correctly identified as Tracey Igoe. She will be referred to herein as "Nurse Igoe."

1

confinement and denying him adequate medical care. (ECF No. 37.) The Court granted Defendant Sherbine's Motion to Dismiss on January 23, 2013. (ECF No. 45.) Consequently, she is no longer a Defendant in this matter. The remaining Defendants have moved for summary judgment on Plaintiff's claims (ECF Nos. 57, 104), and Plaintiff has responded in opposition to their motion (ECF Nos. 68, 69, 81, 82.) As such, Defendants' motion is now ripe for review and should be granted for the reasons stated herein.

## I. Factual Background

Plaintiff's claims arise out of a cell extraction that occurred on May 9, 2008, but the events leading up to the cell extraction require a brief explanation. On May 7, 2008, Plaintiff was temporarily moved from Cell JD-1012 to Cell JD-1006 so that maintenance could be performed in Cell JD-1012 and in order to change Plaintiff's permanent cell assignment. (Defendants' Concise Statement of Material Facts, Exh. A, Declaration of Daniel Meck at ¶ 3; Exh. D, Plaintiffs' Cell History.)[2] While being placed in Cell JD-1006 on May 7, 2008, Plaintiff threatened that he would assault staff at the first opportunity. (Exh. A at ¶ 4; Exh. E, Behavior Modified Meal Request Form.) As a result of these threats, Defendant Meck recommended that Plaintiff be placed on a variety of restrictions, including a Behavioral Modified Meal – a "Bag Meal" where he would receive the same food as other inmates but with minimal containers. (Exh. A at ¶¶ 5-7; Exh. E.) Specifically, he would receive his food in a bag rather than on a food tray. (Exh. A at ¶ 7.) Shift Commander Stephen Ireland approved this recommendation. (Exh. E.)

---

[2] The exhibits cited to herein are exhibits to Defendants' Concise Statement of Material Facts docketed at ECF No. 59-1. They will be hereinafter referred to by their exhibit numbers.

According to Defendant Meck, Plaintiff had a history of assaulting staff, including many incidents where he used food containers to throw bodily fluids, such as feces and urine, at staff members. (Exh. A at ¶ 8.) Defendant Meck's motivation for placing Plaintiff on a Bag Meal was in order to protect staff from this type of behavior, given Plaintiff's explicit threat to assault staff at the first opportunity. (Exh. A at ¶ 9.)

On May 8, 2008, Plaintiff's permanent cell assignment was changed from Cell JD-1012 to Cell JD 1010. (Exh. D.) On May 9, 2008, Plaintiff began siphoning urine and feces under his cell door, contaminating his cell and the housing unit.[3] (Exh. A at ¶ 12; Exh. B, Extraordinary Occurrence Report; Exh. C, DVD.)[4] As a result, it was necessary for Plaintiff to be moved so that the cell could be cleaned and also to prevent him from further contaminating the cell and housing unit. (Id.) Plaintiff was given several direct orders to stop siphoning urine and feces under his cell door and to allow himself to be handcuffed so that he could be removed from the contaminated cell. (Exh. A at ¶ 13; Exh. B; Exh. C.) Plaintiff had also covered the windows in his cell and he was ordered to uncover them. (Exh. B; Exh. C.) Plaintiff refused to comply with all orders. (Exh. A at ¶ 13; Exh. B; Exh. C.) As a result, a cell extraction team was assembled and Defendant Meck was called to supervise the extraction. (Exh. A at ¶ 14; Exh. B; Exh. C.)

Prior to the cell extraction, Defendant Meck confirmed with the medical department that Plaintiff was medically cleared for use of the EBID devices (both handheld and shield) and oleoresin capsaicin ("OC spray") without restriction. (Exh. A at ¶ 15; Exh. B; Exh. C.) After the

---

[3] According to Plaintiff, he was "provoked" into doing so because he was served his meal in a bag instead of on a food tray. He contends that this was in violation of the DOC policy that states inmates should not be placed on a Modified Meal unless they violate food policy, which he contends he did not do, and the DOC policy that states food should not be used as punishment. As a result, he took the food aperture "hostage" and demanded that he be served his food correctly. *See* (ECF No. 70-4, Grievance 230036; ECF No. 70-8, Misconduct Report A602679; ECF No. 70-14, Grievance 231008.)

[4] Exhibit C is a DVD of the cell extraction.

3

extraction team was assembled, Plaintiff was given several more direct orders to permit officers to handcuff him but he refused to comply with all orders. (Exh. A at ¶ 16; Exh. B; Exh. C.) Defendant Meck then administered the OC spray into the cell with the door closed in an attempt to gain compliance without the use of force. (Exh. A at ¶ 17; Exh. B; Exh. C.) Plaintiff bent the nozzle when Defendant Meck attempted to administer a second dose. (Id.) Because Plaintiff refused to come out of his cell, an extraction was necessary. (Exh. B; Exh. C.)

In preparation for the cell extraction, Plaintiff cut up his foam mattress and used it to pad his jumpsuit. (Id.) He then refused orders to remove it. (Id.) He had also covered the floor with feces and an unknown liquid in order to make the floor slippery for staff entering the cell. (Id.) During the cell extraction, Plaintiff attempted to physically assault staff by throwing feces and an unknown liquid on them and by swinging at them when they entered the cell. (Exh. B; Exh. C; Exh. F, Misconduct Report A467596.) He also threatened staff. (Id.) Plaintiff received a misconduct for these actions, as well as for refusing to obey the direct orders to remove the protected clothing and be handcuffed. (Exh. F.)

Upon entry to the cell, Plaintiff was secured relatively quickly. (Exh. B; Exh. C.) Afterwards, he was carried by his limbs and jumpsuit to Cell JD-1006 where his jumpsuit was cut off, he was strip searched, restraints were removed, and the door was secured. (Exh. A at ¶ 19.) He was then assessed through the window of the door to Cell JD-1006 by Defendant Nurse Igoee. (Exh. B, Medical Incident/Injury Report; Exh. C.) According to medical reports, Plaintiff did not sustain significant injuries as a result of the extraction. (Exh. B.) He had indentations on his wrists from the handcuffs, but no visible bleeding or breaks in the skin. (Id.) No treatment was necessary. (Id.) Plaintiff was advised to sign up for a sick call with the Physician's

4

Assistant if he needed further evaluation. (Id.) The abrasions on his wrists healed within several days. (ECF No. 70-10, Medical Progress Notes.)

Plaintiff was given access to water so that he could decontaminate himself after being placed in Cell JD-1006. (Exh. B, Extraordinary Occurrence Report; Exh. C.) He also had a working toilet and was provided with a security smock and/or blanket, toilet paper, food, water, and other necessities while housed in Cell JD-1006. (Exh. A at ¶¶ 26-28.)

## II. Legal Standard

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski,

922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

### III. Discussion

#### A. Personal Involvement of Defendant Best

Plaintiff's claims against Defendant Best arise solely out of the cell extraction that took place on May 9, 2008. However, Defendants maintain that Defendant Best was not involved in the cell extraction and he should therefore be granted summary judgment based on lack of personal involvement.

For liability under 42 U.S.C. § 1983, a defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207. However, alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement; allegations "must be made with appropriate particularity." Id.

Initially, Plaintiff denied Defendants' contention saying that Defendant Best "could" have been involved. However, after he reviewed the DVD of the extraction at issue, he

conceded that Defendant Best was not involved in said extraction. *See* ECF No. 82 at 2. The evidence of record supports the conclusion that Defendant Best was in no way involved in the May 9, 2008 extraction and a review of the DVD verifies this conclusion. Consequently, Defendant Best should be granted summary judgment on Plaintiff's claims.

### B. Bag Meal Claim

#### a. Violation of DOC Policy and Procedure

Plaintiff claims that Defendant Meck violated the DOC policy and procedure on food service, DC-ADM 610, by directing his 6-2 shift officers to feed him a Bag Meal. Notwithstanding that no such violation occurred, state agency guidelines do not, in and of themselves, create a right, and do not have the force of law. *See* Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142, 154 (3d Cir. 2004); *see also* Atwell v. Lavan, 557 F. Supp. 2d 532, 556 n.24 (M.D. Pa. Dec. 21, 2007) (a prison policy manual does not have the force of law and does not rise to the level of a regulation). As such, a violation of internal policy does not automatically rise to the level of a Constitutional violation. Whitcraft v. Township of Cherry Hill, 974 F. Supp. 392, 398 (D. N.J. 1996) (citing Daniels v. Williams, 474 U.S. 327, 332-33 (1986); Edwards v. Baer, 863 F.2d 606, 608 (8th Cir. 1988); Jones v. Chieffo, 833 F. Supp. 498, 505-06 (E.D. Pa. 1993)). *See also* Hovater v. Robinson, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); Walker v. Zenk, No. 01-1644, 2007 U.S. Dist. LEXIS 96351, at *29-30 n.19 (M.D. Pa. Nov. 15, 2007) (*adopted in part and rejected in part by* 2008 U.S. Dist. LEXIS 9086 (M.D. Pa. Feb. 7, 2008) ("[A]lleged violations of prison policies do[] not rise to the level of a Constitutional claim."); Estrella v. Hogsten, No. 06-1340, 2007 U.S. Dist. LEXIS 51208, at *21 (M.D. Pa. July 16, 2007) (holding that mere failure of prison officials to follow their own

regulations alone is not a constitutional violation). Moreover, the policy at issue does not create a right under state law either. Indeed, DC-ADM 610, Section VIII specifically states, "This policy does not create rights in any person . . . ." Because Plaintiff does not have an enforceable right under the pertinent DOC policy and procedure, Defendant Meck should be granted summary judgment on this claim.

**b. Eighth Amendment**

Plaintiff maintains that Defendant Meck also violated the Eighth Amendment by directing his officers to feed him a Bag Meal. As noted above, Plaintiff was placed on a Behavior Modified Meal on May 7, 2008, due to his threat to assault staff at the first opportunity and his history of assaulting staff by using food containers to throw bodily fluids at staff members, including urine and feces. Plaintiff received a Bag Meal, which contained essentially the same food as the other inmates but prepared to eliminate the need for serving containers and the use of eating utensils. Plaintiff contends that this was cruel and unusual punishment.

While inmates have a right to a nutritionally adequate diet, Laufgas v. Speziale, 263 F. App'x 192, 198 (3d Cir. 2008) (citing Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980)), they have no constitutional right to be served a particular type of meal, Burgin v. Nix, 899 F.2d 733, 734-35 (8th Cir. 1990). Accordingly, this Court has recognized in the past that providing an inmate with food loaf[5] for seven days "is not a violation of the Eighth Amendment even if it is a punitive measure." Brown v. Sobina, No. 08-128E, 2009 U.S. Dist. LEXIS 120683, 2009 WL 5173717, at *6 (W.D. Pa. Dec. 29, 2009). Similarly, other courts have found that subjecting inmates to a food loaf diet for as long as fourteen days does not constitute a violation of the

---

[5] According to DOC policy, "[a] food-loaf is a 29-30 ounce loaf (raw weight) made of various food ingredients as specified by the Department's standard recipe, that when blended together and baked, contains all the necessary caloric and nutritional requirements." DC-ADM 610, Food Service Procedures Manual, Section 3(B)(2).

8

Eighth Amendment. *See* Boswell v. Myers, 909 F.2d 1482 (6th Cir. 1990) (Table); *see also* Gates v. Huibregtse, 69 F. App'x 326, 327 (7th Cir. 2003) (placing inmate on temporary nutria-loaf diet due to misconduct during meal service was not a violation of the Eighth Amendment); LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993) (providing nutra-loaf, a nutritionally adequate blend of fresh ingredients designed to be given to inmates without eating utensils, is not deprivation serious enough to violate the Eighth Amendment); Adams v. Kincheloe, 743 F. Supp. 1385, 1391 (E.D. Wash. 1990) (placing inmate on disciplinary five-day diet of "nutra-loaf" did not violate the Eighth Amendment).

Here, Plaintiff was placed on a Bag Meal, not even a food loaf, and received the same food as the other inmates but in a paper bag. This was done in an effort to protect staff from Plaintiff using food containers to assault staff. Clearly, Plaintiff's constitutional rights were not violated, and Defendant Meck should be granted summary judgment on this claim.

**C. Excessive Force Claim**

Plaintiff claims that he was subjected to excessive force during his cell extraction on May 9, 2008. Under the Cruel and Unusual Punishments Clause of the Eighth Amendment, inmates are protected against the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 219 (1986). In the context of an excessive force claim, the core judicial inquiry of whether the measure taken inflicted unnecessary and wanton pain and suffering is that set out in Whitley: "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). Although the Eighth Amendment protects inmates against cruel and unusual punishment, it "does not protect an inmate against an objectively *de minimis* use of force." Smith v. Mensinger,

9

293 F.3d 641, 648 (3d Cir. 2002). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9.

In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: "(1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of the forceful response." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (internal quotations and citation omitted). The extent of any injuries that an inmate suffers is relevant, but "does not end" this analysis. Hudson, 503 U.S. at 7. Consideration of these factors permit a court to make inferences concerning "whether the use of force could plausibly have been thought necessary" or whether the circumstances show "such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). "Summary judgment in favor of a defendant is not appropriate if it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." Brooks, 204 F.3d at 106 (citing Whitley, 475 U.S. at 322.)

Plaintiff claims that, during the cell extraction, OC was sprayed between his buttocks and that he was shocked on his groins by the EBID device. He further claims that he was carried to Cell JD-1006 naked and by his handcuffs and shackles, which caused pain and injuries, and that he was "tortured" by the extraction team. As previously noted, Defendants have submitted a DVD of the cell extraction at issue which the undersigned as viewed. The video shows that, on May 9, 2008, Plaintiff began siphoning urine and feces under his cell door. He was given several

direct orders to stop and also to allow himself to be handcuffed so that he could be removed from the contaminated cell in order for it to be cleaned. Plaintiff refused to comply with all orders. He also refused an order to uncover the window in his cell. As a result, a cell extraction team was assembled and supervised by Defendant Meck who confirmed that Plaintiff was medically cleared for use of the EBID devices and OC spray.

Prior to the extraction, Plaintiff was given several more direct orders to permit officers to handcuff him so that he could be removed. Plaintiff again refused the orders and Defendant Meck administered OC spray in an attempt to gain compliance without the use of force. The OC spray was administered at the cell with the door closed. It had no apparent effect on Plaintiff, and, when Defendant Meck attempted to administer the spray again, Plaintiff bent the nozzle. Other than administering the OC spray while the cell door was closed, Defendant Meck had no hands-on role in the cell extraction and he did not personally use force on Plaintiff. The OC was not sprayed in Plaintiff's buttocks and was not used after the cell door was open.

When Plaintiff refused to voluntarily come out of his cell after the OC was administered, a cell extraction was necessary. Plaintiff cut up his foam mattress and used it to pad his jumpsuit. He refused to remove the padding from his jumpsuit and had covered the floor with feces and an unknown liquid in preparation for the cell entry. During the cell extraction, Plaintiff attempted to physically assault the extraction team by throwing feces and an unknown liquid on them and by swinging at them when they entered the cell. He was secured relatively quickly and carried by his limbs and jumpsuit to Cell JD-1006. He was not carried to the cell naked or by his restraints.

Once in Cell JD-1006, the extraction team cut off his jumpsuit to remove the pads, performed a strip search, removed the restraints, and secured the door. Although the EBID

devices were present, it appears on the video that either one or both devices may have malfunctioned during the actual extraction. In any event, the devices were not used on Plaintiff's groins and it does not appear that they were used on his body at all.

Upon review of the record, including the DVD, and examining the circumstances of this case under the appropriate factors, it is clear that the force applied was not excessive. In an effort to avoid using force, Defendant Meck gave Plaintiff numerous orders, with which he did not comply, and administered OC spray, which had no apparent effect. After it was clear that Plaintiff would not voluntarily come out of his cell, it was necessary to use force to accomplish the goal of moving Plaintiff so that his cell and the unit could be decontaminated. The amount of force used was minimal, limited to that which was necessary, and applied in a good-faith effort to maintain and restore discipline. At no time on the video, which captures the entire cell extraction, including the preparation prior and the aftermath, is Plaintiff being seen punched, kicked, tortured, pulled by his restraints, or otherwise subjected to more force than was necessary. Most importantly, other than supervising the extraction team and administering the OC, Defendant Meck had no hands-on involvement.

As instructed by the Supreme Court, "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." Whitley, 475 U.S. at 321-22. Here, Plaintiff's allegations are discredited by the DVD and the record evidence, including the medical evidence, which fails to show force was applied maliciously or sadistically to cause harm.[6] Indeed, the evidence in this matter indicates that the

---

[6] "Although not dispositive, [a] [p]laintiff's injuries are relevant to determining if excessive force was used against [him]." Thomas v. Ferguson, 361 F. Supp. 2d 435, 438 (D. N.J. 2004) (citing Brooks, 204 F.3d at 108).

12

use of force was objectively *de minimis* and insufficient to establish an Eighth Amendment violation. No rational trier of fact could view the video footage and find for Plaintiff in this case. Consequently, Defendant Meck should be entitled to summary judgment on this claim.

### D. Deliberate Indifference to Medical Needs

Plaintiff claims that Defendant Nurse Igoe denied him medical care because he was not given medical attention following the cell extraction. An inmate making an Eighth Amendment claim on the basis of the denial of medical treatment must show "(1) that the defendants were deliberately indifferent to [his or her] medical needs and (2) that those needs were serious." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Again, the record evidence, including the DVD of the cell extraction and the aftermath, and Plaintiff's medical records, belies Plaintiff's claims. Following the cell extraction, Plaintiff was assessed by Defendant Nurse Igoe through the window in the cell door and no major injuries were noted. Plaintiff had indentations around his wrists from the application of the handcuffs but no treatment was needed. There was no bleeding or break in the skin. He was told to put in a sick call if he needed follow up treatment. When Plaintiff was assessed a few days later, it was noted that the abrasions to his wrists were healing and he had good range of motion. Plaintiff takes issue with the fact that Defendant Nurse Igoe examined him through the window on the cell door but he offers nothing more than his bare assertions to dispute the overwhelming evidence showing that Defendant Nurse Igoe was not deliberately indifferent to his serious

---

"[T]he degree of resulting injury [can be] highly relevant to the determination of the unreasonableness of the force used. . . ." Brooks, 204 F.3d at 108. Defendant Nurse Igoe assessed Plaintiff at his cell door immediately following the incident and observed that Plaintiff had indentations around his wrists from application of the cuffs, but no visible bleeding or breaks in the skin. No treatment was necessary. The fact that Plaintiff suffered only the most minor of injuries is highly relevant and is strong indication that excessive force was not used by either Defendant Meck or any member of the extraction team.

medical needs. Consequently, summary judgment should be granted in favor of Defendant Nurse Igoe.

### E. Conditions of Confinement Claim

Finally, Plaintiff challenges the conditions of his confinement when he was housed in Cell JD-1006, a "strip cell," following the cell extraction on May 9, 2008. Specifically, Plaintiff claims that he was left for approximately nine days without clothes, running water, a working toilet, mattress, security blanket, smock, and other necessities. He also claims that his cell was cold and that he was not given a shower to decontaminate himself after the extraction.

In order to succeed on an Eighth Amendment conditions of confinement claim, Plaintiff must demonstrate both that he was subjected to a sufficiently serious deprivation that resulted in the denial of "the minimal measure of life's necessities" and that this was done while Defendants had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994). With respect to the first requirement, conditions cited by an inmate must be "objectively, sufficiently serious [and] must result in the denial of the minimal civilized measure of life's necessities." Id. at 834 (internal citation and quotation omitted). Only "extreme deprivations" are sufficient to make out a conditions of confinement claim. Hudson v. McMillian, 503 U.S. 1, 8-9 (1992). A plaintiff must prove that the deprivation is sufficiently serious when viewed within the context of "contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 36 (1993). Although a combination of confinement conditions – considered alone constitutionally insufficient – may present an Eighth Amendment violation, they nevertheless must cumulatively produce "the deprivation of a single, identifiable human need such as food, warmth, or exercise . . . ." Wilson v. Seiter, 501 U.S. 294, 304 (1991). In applying this test, the Court should acknowledge that "[t]he Constitution . . . does not mandate comfortable prisons." Wilson, 501 U.S. at 298. "In

considering whether a prisoner has been deprived of his rights, courts may consider the length of time that the prisoner must go without those benefits." Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982) (citing Hutto v. Finney, 437 U.S. 678, 685 (1978)).

With respect to the second element, the plaintiff must demonstrate deliberate indifference to prison conditions on the part of prison officials. Farmer, 511 U.S. at 833; Wilson, 501 U.S. at 297; Rhodes v. Chapman, 452 U.S. 337, 347 (1981). This requires a court to determine, subjectively, whether the officials acted with a sufficiently culpable state of mind. Id.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . . The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."

Farmer, 511 U.S. at 838. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. A trier of fact may infer the existence of this substantive state of mind from the fact that the risk of harm is obvious. Id. at 842.

With this standard in mind, the undersigned turns to Plaintiff's claims. First, the undersigned notes that Defendant Meck has presented evidence demonstrating that Plaintiff was provided with access to water following the extraction in order to decontaminate himself (ECF No. 59-1 at 9, 10, 13) and Plaintiff has offered no evidence to the contrary. Moreover, according to Defendant Meck, Plaintiff was provided with a working toilet, security smock and/or blanket, toilet paper, food, and water. (ECF No. 59-1 at 6.) Nevertheless, even if the conditions complained of by Plaintiff are true, while uncomfortable, they do not constitute a denial of "the

minimal civilized measures of life's necessities" and Plaintiff has introduced no evidence to establish that these conditions "pos[ed] a substantial risk of serious harm."[7] Farmer, 511 U.S. at 834; *see also* Williams v. Delo, 49 F.3d 442, 444-47 (8th Cir. 1995) (finding no Eighth Amendment violation where prisoner was placed in a strip cell without clothes, the water in the cell was turned off and the mattress removed, and prisoner's bedding, clothing, legal mail, and hygiene supplies were withheld); Adderly v. Ferrier, 419 F. App'x 135, 139-40 (3d Cir. 2011) (denial of clothing, toiletries, legal mail, mattress and shower for seven days did not constitute Eighth Amendment violation); Millhouse v. Gee, No. 09-2134, 2011 U.S. Dist. LEXIS 91749, 2011 WL 3627414 (M.D. Pa. Aug 17, 2011) (two week denial of mattress was not sufficiently serious to rise to the level of an Eighth Amendment violation). Furthermore, Plaintiff has failed to show any deliberate indifference on the part of Defendant Meck. Plaintiff was placed in the strip cell as a result of his own actions, which included flooding his cell and the unit with urine and feces, an action he does not deny. For these reasons, Defendant Meck should be granted summary judgment.

### III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 57) be granted and that this case be closed.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule of Court 72.D.2, the parties are allowed fourteen (14) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have

---

[7] Plaintiff complains that his toilet was "broken." However, Plaintiff also complains that the water was shut off so it is reasonable to assume that the toilet could not flush because of this.

fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: January 31, 2013

_____
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Gary Banks
 CT-8731
 SCI Camp Hill
 P.O. Box 200
 Camp Hill, PA 17001
 *Via U.S. Mail*

 Counsel of Record
 *Via ECF Electronic Mail*